**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JIMMY KING | CRIMINAL ACTION<br>NO. 25-430-2 |

**Pappert, J.** **August 21, 2026**

**MEMORANDUM**

On July 23, 2025, FBI agents executed a search warrant on Jimmy King's 3006 Birchview Walk residence in Philadelphia and his GMC pickup truck. They seized thirty pounds of methamphetamine and two firearms, and King made several incriminating statements in the process. A grand jury in the Eastern District of Pennsylvania indicted him a month later on three counts related to the search and returned a superseding indictment on April 1, 2026 charging him, along with Jermaine King and Mahmud Shepard, with conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846, distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i), and possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1).

King now moves to suppress all evidence linked to the search. After holding an evidentiary hearing and reviewing the parties' submissions, the Court denies the motion. The search was lawful because Magistrate Judge Elizabeth Hey had a substantial basis for concluding that probable cause existed, and satisfaction of the

conditions precedent made the anticipatory warrants effective. King also voluntarily, knowingly and intelligently waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) before speaking with authorities.

I

A

FBI Special Agent Kevin Lewis has investigated drug crimes for the past thirty years. (Lewis Aff. ¶¶ 1–2, Gov't's Ex. G-1.) Two confidential informants, "CI#1" and "CI#2," told authorities King was a large-scale drug supplier in Philadelphia. (*Id.* ¶¶ 18–19.) CI#1 has provided the FBI with information for nearly fifteen years that has been corroborated over a hundred times, (*id.* ¶ 18 n.4), and CI#2 gave the FBI reliable information for several months in 2022, (*id.* ¶ 19 n.4.) Lewis learned from CI#1 that "Jim-Jim" had drug connections in California, spent "a lot of his time" there, and let his cousin Jermaine King and "Little Boob" William Mack handle much of his drug business in Philadelphia. (*Id.* ¶ 18.) Both informants identified King by his Pennsylvania driver's license photograph. (*Id.* ¶¶ 18–19.)

Lewis obtained information from FedEx and Comcast that connected King to packages sent from California to Philadelphia. The number for King's cell phone and the IP address for his residential internet at 3006 Birchview Walk tracked two packages in November of 2024 that weighed fifty-six pounds total and were shipped to "Ethan Adelman" at 1531 Hellerman Street. (*Id.* ¶¶ 21–22.) The same number and IP address tracked another package in December of 2024, this time sent to "Avishog Ayelet" at 1531 Hellerman. (*Id.* ¶¶ 23, 26.) Neither of those names were associated with that address. (*Id.* ¶¶ 21, 23.)

The December package included pound quantities of methamphetamine. A certified drug-sniffing dog inspected the package at a FedEx sorting facility in Pennsylvania and alerted authorities to the presence of drugs. (*Id.* ¶ 24.) FBI agents executed a search warrant on the package and found three plastic trash bags with thirty-two heat seal pouches, each weighing one pound and containing a "crystal chalky substance." (*Id.* ¶ 25.) The substance tested positive for methamphetamine. (*Id.*)

King's American Airlines travel records raised additional red flags for Lewis. King flew from Philadelphia to San Diego on the evening of June 15, 2025 and flew back to Philadelphia less than twelve hours later. (*Id.* ¶ 27.) King used his cell phone to book the flights within twenty-four hours of departure. (*Id.*) Lewis knew, based on his thirty years of experience, that drug traffickers frequently book flights close to departure with short turnaround times. (*Id.*)

The FBI monitored a FedEx package sent from California to Philadelphia the day King flew back. (*Id.* ¶¶ 27–28.) His phone number and IP address again tracked the thirty-pound package which was addressed to "Eitan Adelman" at 7100 Eastwood Street—a name and address that again had no connection. (*Id.* ¶¶ 28, 31.) Lewis surveilled 7100 Eastwood the day the package was supposed to be delivered and saw a black GMC pickup truck parked there. (*Id.* ¶ 29.) The GMC left and drove loops around Cottman Avenue and Roosevelt Boulevard for forty-five minutes before returning briefly, leaving again, and following a nearby FedEx truck. (*Id.*) The two parked on the 7100 block of Lynchford Street when King left his truck and "appeared to show the driver his cellular telephone." (*Id.*) The FedEx driver gave King a box he placed in the backseat of the GMC. (*Id.*) King then proceeded to "pull[] into parking

lots, driv[e] into neighborhoods which were not on his route to his residence and pull[] down streets only to stop in the middle of the street and remain there without interacting with anyone." (*Id.*) King finally returned to Birchview and backed the GMC into the garage. (*Id.*) FedEx records showed the package was delivered on the 7100 block of Lynchford—not the intended 7100 Eastwood address. (*Id.* ¶ 30.)

King made similar arrangements two weeks later. He flew from Philadelphia to Los Angeles the night of July 3 and returned the following morning. (*Id.* ¶ 33.) A FedEx package weighing twenty-six pounds was then sent from California to "Jarumah Atkin" at 6700 Harbison Avenue in Philadelphia. (*Id.*) FedEx flagged the package as "suspicious" because months earlier another one was sent to "Jerimah Atkins" at 7100 Eastwood, names and addresses that, once more, had no affiliation. *See* (*Id.*). The day the package was due to be delivered, FBI agents watched a FedEx truck—the same one that delivered the package to King two weeks prior—depart its facility. (*Id.* ¶ 35.) A white Lincoln Nautilus left the garage at Birchview one to two minutes later. (*Id.*) Both vehicles parked near Bustleton Avenue where agents spotted King standing at the passenger side of the FedEx truck apparently "arguing with the driver as he gestured at his cellular telephone." (*Id.*) King took a box from the driver a few minutes later, placed it into the rear hatch of the Lincoln, and drove back to Birchview. (*Id.*) According to FedEx records, the package was marked delivered around the same time King received the box. (*Id.*)

King flew from Philadelphia to Los Angeles on July 16 and returned two days later. (*Id.* ¶¶ 37–38.) A FedEx package weighing thirty-five pounds was mailed from California on July 16 and addressed to "Veil Chantan" at 7100 Eastwood. (*Id.* ¶ 39.)

The package was scheduled to be delivered on July 22. (*Id.*)

B

Before the package arrived, Lewis applied for anticipatory warrants to search Birchview, the GMC, and the Lincoln. He incorporated his affidavit by reference, (Appls. for Search Warrants at 1, 4, Gov't's Ex. G-1), which included conditions to effectuate the warrant:

> JIMMY KING, or any other person, obtains the FEDEX package bearing tracking number 882843212326 from the residence at 7100 Eastwood Street, Philadelphia, PA, or directly from the FEDEX driver responsible for delivering that FEDEX package; and then KING, or any other person obtaining the package, brings that FEDEX package to the TARGET PERMISES; and brings it in the front door of the residence or into the garage of the TARGET PREMISES. Once these conditions are met the warrants for the TARGET PREMISES and TARGET VEHICLE #1 and #2 become effective and the FBI can execute the warrants at any time between 6:00 AM and 10:00 PM within the standard 14-day search warrant time frame.

(Lewis Aff. ¶ 41.) The "TARGET PREMISES" was Birchview, "TARGET VEHICLE #1" was the GMC, and "TAGRET VEHICLE #2" was the Lincoln. (*Id.* ¶ 3.)

Magistrate Judge Elizabeth Hey issued the warrants on July 21. *See* (Appls. for Search Warrants at 2, 5). The basis for the search was "evidence of a crime," "contraband, fruits of crime, or other items illegally possessed," and "property designed for use, intended for use, or used in committing a crime." (*Id.* at 1, 4.) The Government had until August 4 to execute the warrant. (*Id.* at 2, 5.)

C

Lewis and FBI Special Agent John Marcus Heyer testified about the day they executed the warrants, and the Court credits their testimony in all respects. The morning of July 23, Lewis surveilled Birchview while the remaining agents, including a

surveillance aircraft, were stationed at the FedEx facility where the FedEx driver was located. (Aug. 11, 2026 Suppression Hr'g Tr. at 8:17–9:7, 50:2–10, Dkt. No. 62.) King left Birchview in the GMC alone, drove north on I-95, and cut across traffic into an AutoZone parking lot on the corner of Roosevelt and Cottman. (*Id.* at 8:21–24, 9:25–10:5, 13:24–14:2.) The FedEx truck arrived minutes later. (*Id.* at 10:10–12.) The GMC followed the truck down another street where the two parked, and the driver walked toward the GMC as the rear door opened. *See* (July 23, 2025 Aircraft Video No. 1 at 14:01:56–03:05, Gov't's Ex. G-2). The driver placed the package in the backseat and gestured toward the front of the GMC for a minute before shutting the door, *see* (*id.* at 14:03:06–04:13), after which King drove back to Birchview, *see* (Suppression Hr'g at 12:24–13:11). Agents saw the GMC park in the garage and leave a few minutes later, this time with a box in the truck bed. (*Id.* at 16:22–19:10); (July 23, 2025 Aircraft Video No. 2 at 14:30:10–32:10, Gov't's Ex. 3.)

FBI agents executed the warrants once the GMC returned. (Suppression Hr'g at 19:10–18.) They knocked and announced their presence at the front door, at which point the rear door started to open and Heyer identified and handcuffed King. (*Id.* at 19:21–20:24 63:5–20.) Once the residence was secure, Lewis took King upstairs and sat him at a barstool between the kitchen and the living room. (*Id.* at 21:17–25.) Lewis testified that he read King his *Miranda* warnings. (*Id.* at 22:10–20.) He then asked King if he understood those rights, (*id.* at 23:22–24), and King nodded "up and down," (*id.* at 24:2–8.) Lewis memorialized the interaction, stating King "agreed to talk to agents outside the presence of his attorney," (FBI FD-302 at 1, Gov't's Ex. 5), and Heyer confirmed his recollection, (Suppression Hr'g Tr. at 66:1–25.) King never appeared to

be under the influence of drugs or alcohol, or to suffer from a mental disease or defect. (*Id.* at 28:11–25, 67:15–68:10.)

King initially denied having drugs or guns in the residence, said he felt sick, and started to dry heave. (*Id.* at 24:14–25:13); (FBI FD-302 at 1.) Lewis placed a trash can in front of him and offered him food and drink. (Suppression Hr'g Tr. at 25:2–13); (FBI FD-302 at 1.) Agents discovered three plastic tubs shut with lids, which Lewis opened in King's presence. (Suppression Hr'g Tr. at 25:19–26:9); (FBI FD-302 at 1.) King then admitted "the tubs contained methamphetamine" and said he had received them from the FedEx driver earlier that day. (FBI FD-302 at 1.) He stated that he "regularly obtained methamphetamine from multiple suppliers in California and had been doing so for years." (*Id.*) After agents found a revolver in the garage and several magazines for a Glock semi-automatic handgun in a bedroom, King told them where he stashed another firearm. (*Id.* at 1–2.) He also named his supplier in California and gave them the passcode to his cell phone. (*Id.* at 2.)

Lewis brought King back to the FBI Philadelphia Field Office where he was fingerprinted and photographed. (*Id.* at 3.) He again read King his *Miranda* rights but, this time King said he wanted to talk to an attorney. (*Id.*) His request ended the interview. (*Id.*)

II

King contends, for three reasons, that the July 23 search was unlawful. First, he believes Judge Hey did not have a substantial basis for finding probable cause. Second, he argues the conditions precedent for executing the search pursuant to the anticipatory warrants were not triggered and third, he says the good faith exception

does not apply. *See* (Def.'s Mem. of L. at 8–16, Dkt. No. 49).

A

The Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched." U.S. Const. amend. IV. Probable cause "is not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014), and demands only "a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place," *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (citation modified). Anticipatory warrants are "no different in principle from ordinary warrants" but require a condition precedent, or a "triggering condition," to execute the search. *United States v. Grubbs*, 547 U.S. 90, 96 (2006). The supporting affidavit must establish probable cause to find both that "contraband or evidence of a crime will be found in particular place" if the triggering condition occurs and that "the triggering condition will occur." *Id.* at 96–97 (citation omitted).

The Court does not decide this issue *de novo*. It must determine whether "the magistrate [judge] had a substantial basis for concluding that probable cause existed." *Stearn*, 597 F.3d at 554 (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). The analysis is limited to the "four corners" of the affidavit and "doubtful or marginal cases" must be resolved "by the preference . . . accorded to warrants." *United States v. Whitner*, 219 F.3d 289, 296, 299 (3d Cir. 2000) (citation omitted).

Both parties agree the motion is moot with respect to the Lincoln. (Suppression Hr'g Tr. at 5:7–11.)

1

Judge Hey had an ample basis for finding probable cause to search Birchview. "[E]vidence associated with drug dealing needs to be stored somewhere, and . . . a dealer will have the opportunity to conceal it in his home." *Whitner*, 219 F.3d at 298. That "reasonable inference" is based on "three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities." *United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002). Only (1) and (3) are at issue because there is no dispute that King's residence was Birchview. (*Id.* ¶¶ 1, 22, 26, 29, 31.)

a

The affidavit makes it "reasonable to infer that [King] was a drug dealer and not simply a user." *Id.* at 104. Two reliable informants identified him as a large-scale drug trafficker, *see* (Lewis Aff. ¶¶ 18–19), one of whom said he had drug connections in California and spent "a lot of his time" there, (*id.* ¶ 18). Judge Hey had a "substantial basis for crediting" the tips because they were "corroborated in significant part by independence police investigation." *Stearn*, 597 F.3d at 556 (quoting *Gates*, 462 U.S. at 245). Flight records showed King flew from Philadelphia to San Diego and Los Angeles on short-duration trips booked within twenty-four hours of departure. (Lewis Aff. ¶ 27.) He spent "almost the same amount of time" in California on one trip as he did in the air. (*Id.*) Lewis knew abrupt trips like those King made were indicators drug trafficking, (*id.*), and his conclusions deserve "considerable weight" given his thirty years of experience investigating drug crimes for the FBI, *see Whitner*, 219 F.3d at 296

(citation omitted).

Moreover, King was associated with suspicious packages shipped from California to Philadelphia. The number for his cell phone—the same one on his flight reservations—and the IP address for his residential internet tracked four packages, none of which were addressed to King or Birchview. *See* (Lewis Aff. ¶¶ 21–23, 26, 28, 31). Each one weighed over twenty-five pounds and used phony names, such as "Ethan Adelman" and "Eitan Adelman" or "Jerimah Atkins" and "Jarumah Atkin," that had no connection to the delivery address. (*Id.* ¶¶ 21, 23, 28 34.) FedEx even marked these packages as "suspicious" because the names were like those on previous packages shipped to different addresses. (*Id.* ¶¶ 28, 34.) One of them—which King's cell phone and residential internet tracked—contained thirty-two pounds of methamphetamine. (*Id.* ¶¶ 25–26.)

Lewis also saw King divert packages twice from their intended route. He returned from a twelve-hour trip to San Diego on June 16, the same day a package weighing thirty pounds was shipped from California to a fictitious person at 7100 Eastwood. (*Id.* ¶ 28.) King left Eastwood on June 20 and followed a FedEx truck driving in the area. (*Id.* ¶ 29.) He showed the driver his cell phone, took a box from him, and placed it in the rear seat of the GMC. (*Id.*) The package was marked delivered where the two met—not where the package was supposed to go. *See* (*Id.* ¶ 30). King then pulled into parking lots, drove into neighborhoods, and occasionally stopped in the middle of the street and interacted with no one, all of which Lewis believed, based on his training and experience, was meant to detect surveillance. (*Id.* ¶ 29); *see also Burton*, 288 F.3d at 105 (crediting an agent's "experience and training" in

supporting probable cause). King flew to California ten days later and another package was sent to a counterfeit person in Philadelphia. *See* (Lewis Aff. ¶ 34). The day of delivery, the FedEx driver left the FedEx facility and, within minutes, King left Birchview. (*Id.* ¶ 35.) The two met and apparently argued with each other before King took a box from him and, around that time, the package was marked as delivered. (*Id.*) Taken together, Judge Hey had a substantial basis for believing King was a drug dealer. *See Stearn*, 597 F.3d at 554.

b

The affidavit included details linking Birchview to King's drug activities. The residential internet at Birchview tracked four oversized packages sent from California to Philadelphia bearing bogus names with no association to the delivery addresses. (Lewis Aff. ¶¶ 21–23, 26, 28, 31). FBI agents saw King take two of those packages from a FedEx driver and bring them back to Birchview. *See* (*Id.* ¶¶ 29, 35). Because his residence was "the first place" King went after interacting with the FedEx driver, the inference that he kept "evidence of [his] transactions at home . . . is much stronger." *Burton*, 288 F.3d at 104.

King assesses the evidence against him in isolation and concludes there can't be probable cause because he never took possession of the December package, the FBI never searched the other packages, and the affidavit never established that he knew what was inside the packages.[1] *See* (Def.'s Mem. of L. at 9–11). But "statements in an affidavit may not be read in isolation—the affidavit must be read as a whole." *United*

---

[1] King incorrectly says the affidavit does not provide "a sufficient nexus between the garage and the interior of [Birchview]." *See* (Def.'s Mem. of L. at 11). It states that Birchview was "a three-story townhome residence with a front entrance that opens to a common courtyard and a rear facing garage." (Lewis Aff. ¶ 42.)

*States v. Conley*, 4 F.3d 1200, 1208 (3d Cir. 1993). And probable cause does not require "actual observance of criminal conduct when a prudent observant would reasonably infer that a defendant acted illegally." *Burton*, 288 F.3d at 98. The affidavit, "taken as a whole," provided Judge Hey with "a substantial basis for a probable cause determination." *Conley*, 4 F.3d at 1208.

2

The search of the GMC was lawful for similar reasons. King left 7100 Eastwood in the GMC the same day a thirty-pound package was scheduled to be delivered to someone unassociated with that address. (Lewis Aff. ¶¶ 28–29.) He parked near a FedEx truck at a location where the package was marked delivered. (*Id.* ¶¶ 29–30.) King took a box from the FedEx driver, placed it in the rear seat of the GMC, and drove back to Birchview. (*Id.* ¶ 29.) He went into parking lots, streets, and neighborhoods before arriving at Birchview, and Lewis determined based on his training and experience that King did so to evade detection. (*Id.*) Considered in the "particular factual contexts" of his other activities, there was a substantial basis for concluding King used the GMC to traffic drugs. *Burton*, 288 F.3d at 98 (quoting *Gates*, 462 U.S. at 232).

3

The affidavit finally established a fair probability that the triggering condition would occur. The anticipatory warrant was effective once King took a package "directly from the FEDEX driver responsible for deliver[y]" and brought it back to Birchview. (Lewis Aff. ¶ 41.) He had done so twice in the past month, (*id.* ¶¶ 29, 35), and the package at issue matched his prior conduct. He flew from Philadelphia to Los Angeles

on July 16 and, that same day, a package weighing thirty-five pounds was mailed to "Veil Chantan" at 7100 Eastwood—the same sham address as a prior shipment King diverted. (*Id.* ¶¶ 29, 37, 39.) He returned from California forty-eighty hours later, (*id.* ¶ 38), and the package was to be delivered on July 22, (*id.* ¶ 39.). So the affidavit "provided [Judge Hey] with sufficient information to evaluate both aspects of the probable-cause determination." *Grubbs*, 547 U.S. at 97.

B

FBI agents executed the anticipatory warrants because the triggering conditions had occurred. Such conditions establish the required connection between "the item described in the warrant" and "the searched location." *Id.* at 94. But anticipatory warrants "do not always require strict compliance." *United States v. Perkins*, 887 F.3d 272, 275 (6th Cir. 2018). The Court must instead read the warrant and its supporting documents "in a commonsense fashion" and "not hypertechnically." *Id.* (quoting *United States v. Gendron*, 18 F.3d 955, 966 (1st Cir. 1994)).

The warrants became effective on July 23 once King took the FedEx package bearing tracking number 882843212326 from the driver, brought it back to Birchview, and entered the garage. *See* (Lewis Aff. ¶ 41). FBI agents followed a FedEx driver, who had previously delivered packages to King, to an AutoZone parking lot on the corner of Roosevelt and Cottman where the two would often meet. (Suppression Hr'g Tr. at 8:18–9:7, 10:6–16, 59:2–17.) They parked down a nearby street when the driver walked toward King with a single, large package on his shoulder. *See* (Aircraft Video No. 1 at 14:01:50–03:05). That package was consistent with the thirty-five-pound FedEx package listed in the triggering condition, (Lewis Aff. ¶ 39), and ultimately was

the one with tracking number 882843212326, *see* (Suppression Hr'g Tr. at 38:9–19, 39:19–40:11). The driver placed the package in the GMC, and King drove back to his residence and parked in the garage. (*Id.* at 12:24–13:11, 15:1–6.) At this point, Lewis believed the triggering conditions were met. (*Id.* at 17:24–18:1.)

King proposes a hypertechnical interpretation. He believes the conditions could not have been satisfied because Lewis did not recall confirming with FedEx that the specifically numbered package was delivered before executing the warrant. *See* (*Id.* at 83:9–84:12). But Lewis credibly testified that his usual practice was to call "FedEx corporate security at the time" and confirm with them "as soon as the package was delivered." (*Id.* at 38:23–39:3.) He also "was contacting FedEx normally as this was occurring to confirm that [the] package was delivered." (*Id.* at 40:8–9.) Indeed, he had previously checked FedEx records during this investigation to determine where and when packages were delivered. *See* (Lewis Aff. ¶¶ 30, 35). And King did, in fact, take the package with tracking number 882843212326. *See* (Suppression Hr'g Tr. at 38:9–15, 39:19–40:11). Read "in a commonsense fashion," *Perkins*, 887 F.3d at 275, this all allowed law enforcement to execute the warrants.

C

Even if the search was invalid, the Court would not suppress the evidence. Exclusion is inappropriate where the executing officers acted "in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). This test applies equally to anticipatory warrants, *see, e.g.*, *United States v. Brown*, 929 F.3d 1030, 1038 (8th Cir. 2019); *Grubbs*, 547 U.S. at 94, and asks "whether a reasonably well trained officer would have known that the search

was illegal despite the magistrate's authorization," *United States v. Loy*, 191 F.3d 360, 367 (3d Cir. 1999) (quoting *Leon*, 468 U.S. at 922 n.23). But the "good faith exception" does not apply where: (1) "the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit," (2) "the magistrate abandoned his or her judicial role and failed to perform his or her neutral and detached function," (3) "the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" or (4) "the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized." *United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir. 2002) (citation omitted). King only contests (3). *See* (Def.'s Mem. of L. at 15).

The affidavit was not so lacking in indicia of probable cause as to render reliance upon it unreasonable. It was far from a "bare bones" document "based on conclusory statements and lacking factual support." *Loy*, 191 F.3d at 368. Lewis detailed his investigation spanning over three years in which he spoke with two reliable informants, observed King's travel and interactions, and cross-referenced records from FedEx, Comcast, and American Airlines. He cited those facts, and many others, in his affidavit and sought warrants on those bases, all of which "typically suffices to prove that an officer conducted a search in good faith." *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001).

FBI agents also acted in reasonable reliance that the triggering conditions had occurred. They saw King meet the same FedEx driver who had twice delivered packages to him, often at the same AutoZone parking lot where they met on July 23. *See* (Suppression Hr'g Tr. at 8:18–10:16, 59:2–17). Lewis testified that he believed the

triggering conditions were satisfied once King returned to Birchview, (*id.* at 17:24–18:1), and the package found there had tracking number 882843212326, *see* (*id.* at 38:9–15, 39:19–40:11). Nothing in the record showed officers "were dishonest or reckless" in believing the condition had happened, let alone objectively unreasonable. *See Leon*, 468 U.S. at 926. So "even if [King] is correct that the triggering event did not occur, suppression of the search results is unwarranted." *Brown*, 929 F.3d at 1038.

III

Nor will the Court suppress King's statements to Lewis at the residence because he made them after waiving his *Miranda* rights. Such a waiver must be "voluntary, knowing, and intelligent considering the totality of the circumstances." *United States v. Rought*, 11 F.4th 178, 187 (3d Cir. 2021) (citing *Miranda*, 384 U.S. at 444). The Government bears "the burden to establish waiver by a preponderance of the evidence." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

A

Voluntariness requires "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Rought*, 11 F.4th at 187 (quoting *Colorado v. Spring*, 479 U.S. 564, 573 (1987)). That assessment considers "the characteristics of the accused and the details of the interrogation." *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). Both considerations shed light on "the crucial element of police coercion," *id.* (citation omitted), which is a "necessary predicate" to a finding of involuntariness, *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

King's waiver was the product of free and deliberate choice. Lewis and Heyer credibly testified that he affirmatively nodded when asked if he understood his *Miranda* warnings and never asked for an attorney while at Birchview. *See* (Suppression Hr'g Tr. at 23:18–15, 52:18–53:1, 66:19–25, 69:20–23.) A report created a month after the search corroborates their testimony, *see* (FBI FD-302 at 1), as does Lewis's interaction with King at the FBI Philadelphia Field Office. Lewis told him, "I already verbally read you your rights, but I've got to read them again." (Suppression Hr'g Tr. at 31:11–13); (July 23, 2026 FBI Video at 42:37–43, Gov't's Ex. 6.) After King said he wanted a lawyer, Lewis responded:

> All right, well, I mean, again, so we've already talked about a bunch of this stuff. You're -- you know, you say you want to hire -- you probably would hire Anthony Petrone, so if you want to hire Anthony Petrone, that's fine. If you want to talk more about what we can do, this is the way we've got to do that. If you don't want to talk, that's fine, too. It's up to you.

(Suppression Hr'g Tr. at 32:1–7); (FBI Video at 44:03–33.) Lewis repeated, two more times, that he would call counsel "if [King] want[ed]" him to do so. (Suppression Hr'g Tr. at 32:24–33:7); (FBI Video at 44:40–46:33.) During the entire conversation, King never took issue with anything Lewis said, stated he had asked for counsel at Birchview or refused to answer questions there.

Nothing suggests authorities coerced King to incriminate himself. *See Dickerson*, 530 U.S. at 434. Lewis questioned him for roughly thirty minutes in his residence while he sat on a barstool in the kitchen. (Suppression Hr'g Tr. at 21:17–25, 28:7–10.) Agents were moving about the residence setting up search kits and taking photographs. (*Id.* at 23:8–12.) Lewis spoke in a conversational tone and took a break in the questioning while agents searched the residence and resumed questioning once

they found the drugs. (*Id.* at 23:13–15 56:19–22, 66:16–67:14.) He put a trash can in front of King when he said he felt sick and provided him with food and drink. (*Id.* at 25:2–13, 67:10–14.) And agents had their weapons holstered the entire time. (*Id.* at 22:7–9, 23:3–4, 66:11–15.)

Nor was Lewis required to read King his *Miranda* warnings again after questioning resumed. A time lapse can make warnings "stale" where the defendant did not "know and understand his rights" at the time they were given and "the passage of time or an intervening event rendered [him] unable to effectively waive his *Miranda* rights when he was questioned again." *United States v. Pruden*, 398 F.3d 241, 246–47 (3d Cir. 2005) (citation omitted). King knew and understood his rights for the reasons explained, and he points to nothing that rendered him unable to effectively waive his rights when questioning resumed. *See id.* at 247 (finding *Miranda* warnings were still effective after twenty hours).

B

King also knowingly and intelligently waived his rights. To do so, the waiver must be "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Rought*, 11 F.4th at 187 (quoting *Spring*, 479 U.S. at 573). This element considers the totality of the surrounding circumstances including the defendant's "age, experience, education, background, and intelligence." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

King was fully aware of the rights he was abandoning and the consequences of his decision. He appeared alert and oriented during questioning. *See* (Suppression Hr'g Tr. at 29:1–3, 68:8–10). Both Lewis and Heyer credibly testified King was not

suffering from a mental disease or defect or under the influence of drugs or alcohol. (*Id.* at 28:11–25, 67:15–68:10.) To the contrary, King said he "didn't use drugs." (*Id.* at 28:23–25.) And he had previously been arrested and convicted of other crimes, including a federal gun charge, *see* (*id.* at 34:23–25), so he "had prior experience with the criminal justice system and was surely aware that his statements to law enforcement could be used against him," *Rought*, 11 F.4th at 193.

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***
Gerald J. Pappert, J.